ISHAM MIKAEL ET AL. v. EQUITABLE SECURITIES COMPANY.

Decided April 8, 1903.

Homestead—Rural or Urban?—Residence in Small Village.

Defendant, in his application for a loan, stated that the ninety acres farm tract which he proposed to mortgage was no part of his homestead, which consisted of a house and lot in M., and that M. had a population of 100. It was shown by the evidence that defendant, who was both a farmer and merchant, resided with his family on a tract of two acres in M., which was a small collection of houses, consisting of six or seven residences, two stores, a blacksmith shop and a schoolhouse; that five or six families lived there; that it was not incorporated or laid off into lots and blocks, some of the residences being located at or near the corner of certain farms, while others were on small lots of land purchased for the purpose. Held, a village within the meaning of the consti-

tutional provision that an urban homestead may consist of a lot or lots in a city, town or village, and that the farm tract so mortgaged was no part of the homestead.

Appeal from the District Court of Dallas. Tried below before Hon. Richard Morgan.

*H. S. Holman* and *Davis & Garnett,* for appellants.

*Bonner & Gilbert,* for appellee.

KEY, ASSOCIATE JUSTICE.—Appellee brought this action for debt, and to foreclose a mortgage on 90 acres of land near Mountain Springs, in Cooke County, Texas. The only defense relied on was that of homestead. There was a nonjury trial resulting in a judgment for the plaintiff, and the defendants have appealed.

The land in controversy is a 90-acre farm situated near Mountain Springs. The original mortgage was made January 1, 1889, upon an application therefor signed and sworn to by appellant Isham Mikael October 1, 1888, in which application he stated that the 90 acres of land was no part of his homestead, and that his homestead consisted of a house and lot in Mountain Springs; and he further stated in the application that Mountain Springs contained a population of 100. In 1895 he made similar statements in another application, upon which time of payment of the debt was extended.

The undisputed testimony shows that at the time that the original mortgage was made, Isham Mikael was a married man, the head of a family, and resided in a residence owned by him on a two-acre lot of land in Mountain Springs. His residence was about 300 yards from his farm.

Mountain Springs was a small collection of houses, consisting of six or seven residences, two stores, a blacksmith shop, a gin house, and a school house, which was also used for church purposes. At the time of the trial, which was in 1902, there was no gin at Mountain Springs, and had not been for several years. Whether or not there was a gin there when the mortgage was created is not made clear by the testimony. Some of the witnesses testified that at that time there were five or six families residing in Mountain Springs, which testimony will support a finding that there were six families residing there at that time. No witness appears to have been asked for an estimate of the number of persons to each family, or for an estimate of the number of people then residing in Mountain Springs. However, the plaintiff put in evidence the sworn statement of the defendant Isham Mikael, to the effect that Mountain Springs contained a population of 100 a short time before the mortgage was originally made and also at the time of its renewal. The several families may have been very large, and some of them may have kept boarders; so that it may be possible that the defendant's sworn statement as to the population of Mountain Springs was correct.

At the time the debt was created, Isham Mikael was both farmer and merchant. He was cultivating a portion of the 90-acre farm, and he also owned a half interest in a storehouse and small stock of merchandise in Mountain Springs, and part of the time he worked on the farm, and part of the time in the store.

The testimony shows that the several heads of families in Mountain Springs were engaged in farming. One was also a blacksmith, and Isham Mikael and an unmarried man named Maddox were merchants. Mountain Springs has never been incorporated, nor laid off into blocks and lots; and several of the witnesses testified that they had never heard it called a village, though some of them stated that it was a fact that Isham Mikael lived in the village of Mountain Springs. Some of the residences were located at or near the corner of certain farms, while others were located on small lots or blocks of land which had been purchased for the purpose. Isham Mikael was the postmaster, and while it does not clearly appear, the inference is that he kept the postoffice in his store.

His residence was about 100 feet from the store. The school house was located between Mikael's residence and his 90-acre farm. The testimony does not disclose the exact location of the other buildings, except the other storehouse, which was across the road from Mikael's, but indicates that they were near by. One witness said they were rather in a cluster; were as near as they ordinarily are in a little village.

Under the Constitution of this State the homestead may consist of lot or lots in a city, town or village; and if the family does not reside in a city, town or village, then it may consist of any quantity of land not exceeding 200 acres when used for homestead purposes.

In this case it is strenuously contended on behalf of Mikael and his wife that at the time the mortgage was created they resided in the country, and were using the 90-acre farm for homestead purposes, and therefore could not, on account of constitutional prohibition, incumber it by a mortgage.

On the other hand it is contended on behalf of appellee that at the time the mortgage was created appellants resided in the village of Mountain Springs, and therefore the farm was no part of their homestead.

It is well settled that homestead rights can not be blended; that a homestead must be either rural or urban, and can not be both. From this it follows that if Mountain Springs was a village, and if appellants resided in that village at the time the mortgage was created, then the farm was no part of their homestead.

The trial judge filed no conclusions of fact and law, but we presume that he reached the conclusion that Mountain Springs was a village, and that appellants resided therein. Should this court declare such conclusion to be unsupported by the testimony? We think not.

As to homestead rights, the term "village" is not defined by the Constitution or by statute; and therefore, in construing the Constitution, that term should be given its ordinary and usual signification. Turning to

the lexicons, we find that Webster defines a village to be "a small assemblage of houses, less than a town or city, and inhabited chiefly by farmers and other laboring people." The definition given by Bouvier's Law Dictionary is: "Any small assemblage of houses for dwellings or business or both in the country, whether they are situated upon regularly laid out streets and lots or not."

The courts have also been frequently called upon to determine what constitutes a village. In the case of People v. McCune (Utah), 35 L. R. A., 398, where it appeared from the evidence that a settlement consisted of fourteen families residing along a stream for a distance of two and one-half miles, some within forty rods of each other and others being distant one mile or more, and whose chief occupation was farming, and in which territory were a district school and a postoffice, and the nearest settlement to the north was distant about fifteen miles, to the west about twelve miles and to the south about six miles, it was held that the trial court correctly instructed the jury, as a matter of law, that such a settlement was a village within the meaning of the statute which prohibited the pollution of any stream of water within seven miles of any city, town or village when the stream was used by the inhabitants of such city, town or village. That case is accompanied by an interesting note, discussing many cases bearing on the subject.

In Railway Co. v. Williams, 27 Ill., 49, and Railway Co. v. Spangler, 71 Ill., 569, similar collections of inhabited houses to those disclosed by the testimony in this case were held to be villages within the meaning of a statute of that State exempting railroads from fencing their tracks within the limits of cities, towns or villages.

In Iken v. Olenick, 42 Texas, 195, Olenick lived with his family at a place not laid off into lots and streets, called a settlement, and which was a small collection of houses in the country. He owned four acres of land in two separate tracts or lots, on one of which, upon which was a storehouse in which he was doing business as a merchant, he gave a deed of trust. At that time the Constitution did not, as it does now, exempt as homestead the place of business used by the head of the family when the residence homestead is within a city, town or village. In that case, the Supreme Court expressly held that Olenick's place of business was in a village, and also considered his residence as within the village, because, for the first time, it announced the rule that property situated in a city, town or village and disconnected from the residence of the family within such city, town or village, was not a portion of the homestead, unless such disconnected lot or lots were in some manner used for homestead purposes. As a matter of fact, the decision in that case caused the change which was subsequently made in the Constitution exempting as part of the urban homestead the property used by the head of the family as a place of business. Miller v. Menke, 56 Texas, 540.

In Martin Clothing Co. v. Henly, 83 Texas, 592, the following facts were shown by the testimony: "Henly testified that at the time the writ of attachment was levied upon his half interest in the lots, he was

living in the village of Bedford, which consisted of eight or ten houses built along the public road, and containing twenty to thirty inhabitants; that said town had never been mapped or platted nor laid out into lots and blocks; that the land was not sold by blocks and lots, but by measured parts of the original surveys; that at the time the debt sued on was contracted, he was a merchant selling goods at Bedford, and that becoming embarrassed, he made a deed of trust conveying to a trustee his stock of goods and everything he had, except his dwelling house, with a lot of about two acres upon which it is situated, and the gin property adjoining the same; that after that time his brother bought his old stock; that while defendant was a merchant he owned and still owns a half interest in the gin property levied upon in this case, which consists of a ginhouse, machinery, and about three acres of land. Defendant acquired said property by two purchases. He first bought a one-fourth and afterwards another fourth undivided interest; that before and at the time of levy, Ed Hovenkamp owned the other half interest in the same; that defendant did not run said gin, but clerked in his brother's store; that defendant is a married man and head of a family, and he lives with his family in his dwelling house adjoining the said gin property, which at the time he purchased it was separated from his dwelling by a fence only; that afterwards, with defendant's consent, a public road was established between the gin property and his dwelling; that defendant used the gin lot for watering his cattle in the tank situated thereon; that he watered his horse at the tank when he had one, and used the gin lot for the preceding winter for penning and fattening his hogs, he having his hog pen in said gin lot; that he never ran said gin himself nor worked at it; that the defendant claimed the gin property as part of his homestead, which was the reason that he did not include the same in the deed of trust to J. M. Moore; that since plaintiff levied the writ of attachment on said property, he had executed a deed of trust on the same to secure Sanger Bros. of Dallas, in a debt which he owed them."

In that case the Supreme Court said: "The record does not make it entirely clear whether the defendant was occupying a town or a country homestead. If it was the latter, then we think his interest in the ginhouse lot should be held to be a part of it and exempt from the attachment. The charge of the court, however, evidently treated the defendant as the occupant of a town homestead. The evidence, taken as a whole, leads to the conclusion that the defendant's homestead was properly regarded by the court as urban, and not rural."

.Posey v. Bass, 77 Texas, 512; Wilder v. McConnell, 91 Texas, 600; Paris Exchange Bank v. Hulen, 21 Texas Civ. App., 285, and similar cases relied on by appellants, are not altogether analogous. In those cases corporate limits had been extended so as to include property which theretofore was rural; but in this case, in so far as the testimony shows, there has been no extension of the limits of the village.

In view of the decisions referred to, which seem to support the con-

clusion reached by the trial court, we are not prepared to say that that conclusion was wrong and should be set aside.

No error has been shown and the judgment is affirmed.

                                                                *Affirmed.*

Writ of error refused.